[Civ. No. 20559. Second Dist., Div. Three. May 11, 1955.]

ANDERSEN-CARLSON MANUFACTURING COMPANY (a Corporation), Respondent, v. FRANCHISE TAX BOARD, Appellant.

Edmund G. Brown, Attorney General, James E. Sabine, Assistant Attorney General, and Edward Sumner, Deputy Attorney General, for Appellant.

Danielson & St. Clair for Respondent.

WOOD (Parker), J.—In this action for a refund of taxes, defendant appeals from a judgment in favor of plaintiff.

Plaintiff corporation paid corporation taxes, under protest, for the year 1950. Plaintiff asserts that, during the first part of 1950, it sold its assets and effected a dissolution of the corporation, and therefore it is not liable for taxes except for the portion of the year prior to the dissolution. Defendant asserts that the cessation of business or corporate existence was not pursuant to a sale but was pursuant to a reorganization, consolidation or merger within the meaning of section 13(k) (1) of the Bank and Corporation Franchise Tax Act (Stats. 1949, chap. 513, pp. 891-892; effective June 4, 1949), and therefore plaintiff is liable for taxes for the whole year.

The action was tried upon a written stipulation of facts.

Plaintiff, if entitled to a refund, is entitled to judgment in the sum of $4,421.13 with interest. In July, 1948, plaintiff entered into a contract with Rome Cable Corporation (referred to as "Rome"), a New York corporation qualified to do business in California. Prior to execution of the contract the stockholders of plaintiff corporation authorized its officers to execute the contract, and the commissioner of corporations issued a permit authorizing execution of the contract.

The contract, a copy of which is attached to the stipulation, recited in substance: that Rome had made a loan of $25,000 to plaintiff and agreed to advance an additional sum of $175,000 to plaintiff; when $200,000 had been advanced, plaintiff would execute its promissory note for that amount to be paid April 15, 1950; plaintiff made certain representations regarding the status of plaintiff as a California corporation, its financial condition, and title to its properties; the contract was made upon certain conditions, including ratification by the board of directors and the stockholders of plaintiff, approval by the commissioner of corporations, and an audit of the books of plaintiff; plaintiff gave Rome an option to purchase all the assets of plaintiff on or before January 15, 1950, except the sum of $2,500 (which would be retained to pay expenses of dissolution); the purchase price would be the agreement by Rome to assume and pay all liabilities of plaintiff appearing on its books, and to issue and deliver to plaintiff a certain number of shares of stock of Rome; the number of shares to be delivered by Rome would be 25,000 if the book value of plaintiff's stock, as of the date of exercise of the option, did not exceed $10 per share—but if plaintiff had a satisfactory earning capacity prior to March 31, 1949, and the option had not been exercised before that date, the number of shares would be 27,500; if the book value of plaintiff's stock, as of the date of the exercise of the option, exceeded $10 per share, then the number of shares of Rome stock would be determined by the ratio between the then respective book values of the stock of Rome and of plaintiff as set forth in a table in the contract; plaintiff had the right after January 3, 1949, to repay said amounts with interest; Rome had the right, within 100 days after it received notice from plaintiff of its intention to repay the loan, to exercise the option to purchase the assets of plaintiffs; plaintiff agreed that so long as any portion of the loan was unpaid, it would furnish Rome with monthly balance sheets and operating statements, and it would permit Rome's representatives to inspect its properties and books.

The stipulation of facts also stated: In September, 1949, Rome adopted a resolution requesting that plaintiff call a meeting of plaintiff's stockholders for the purpose of amending the contract to give Rome the alternative right to acquire all the stock of plaintiff (in lieu of purchasing the assets). Plaintiff rejected the request. In a letter to plaintiff, dated October 6, 1949, Rome gave notice that it elected to exercise its option to purchase the assets of plaintiff. On January 3, 1950, plaintiff transferred to Rome all its assets, except $2,500, by executing and delivering to it a grant deed conveying its real property, a bill of sale of its tangible personal property, and an assignment of all its other assets (except $2,500). On said January 3, Rome delivered to plaintiff 27,500 shares of its stock, and it executed an agreement assuming and agreeing to pay the liabilities appearing on plaintiff's books on that date. At the time of delivery of the 27,500 shares of stock, Rome had 407,975½ shares of stock outstanding which had a market value of $9.87½ per share. Plaintiff had 50,000 shares of stock outstanding which were held by 68 stockholders or groups of stockholders, and no single stockholder had more than 5½ per cent of the total outstanding shares. Plaintiff distributed pro rata the 27,500 shares (received from Rome) to the holders of its 50,000 shares. From the date of the transfer, January 3, 1950, Rome operated the plant it acquired from plaintiff. There was no basic change in personnel, and the president of plaintiff was employed by Rome as general manager in charge of operations of the plant. On March 15, 1950, plaintiff filed with the secretary of state a certificate of winding up and dissolution of plaintiff corporation.

Section 13(k)(1) of the Bank and Corporation Franchise Tax Act (Stats. 1949, chap. 513, pp. 891-892) provides that: "Any bank or corporation which is dissolved . . . during any taxable year shall pay a tax hereunder only for the months of such taxable year which precede the effective date of such dissolution . . . provided further, that the taxes levied under this act shall not be subject to abatement or refund because of the cessation of business or corporate existence of any bank or corporation pursuant to a reorganization, consolidation, or merger. . . ."

■ Appellant contends, as above stated, that the transaction herein was a reorganization, consolidation, or merger within the meaning of said section 13(k)(1). It argues, in effect, that there was no substantial change in the business

operations and interests, since the plant was operated under the management of the former president of plaintiff, with no basic change in personnel. It argues further that the stockholders of plaintiff and Rome retained their respective interests in the combined assets of the two corporations in the same proportions as existed prior to the dissolution of plaintiff. Appellant relies upon the case of *San Joaquin Ginning Co.* v. *McColgan,* 20 Cal.2d 254 [125 P.2d 36], wherein it was held that plaintiff was not entitled to a refund of taxes for the portion of the year after the dissolution. The facts therein are distinguishable from the facts in the present case. In that case the plaintiff corporation was a subsidiary of another corporation which owned all the stock of that plaintiff; the parent corporation elected to dissolve the plaintiff corporation pursuant to an agreed plan of liquidation; plaintiff therein filed a certificate of dissolution and, after payment of its debts, delivered its property and assets to the parent corporation, and the stock of plaintiff corporation was cancelled; thereafter the parent corporation used the property, received from plaintiff, in conducting the same business operations formerly conducted by plaintiff. It was stated therein at page 263: ''The same interests were represented in fact, if not in form, by the same stockholders before and after the transfer. Before the transfer and dissolution the stockholders of the parent corporation owned their interest in the subsidiary through the parent's holding of all the stock of the subsidiary. After the transfer their interest continued in the same measure as before through the direct ownership by the parent of the subsidiary's properties. No change of interest can be said to have occurred to warrant the conclusion that a reorganization within the language of the definition had not taken place.'' In the present case, plaintiff was not a subsidiary of Rome. It does not appear that Rome owned any of plaintiff's stock or that plaintiff owned any of Rome's stock. The relationship of debtor and creditor existed between plaintiff and Rome. In 1948, about one and one-half years before the dissolution, plaintiff corporation and Rome entered into a contract regarding loans of money by Rome to plaintiff, and the contract included a provision that plaintiff corporation thereby gave Rome an option to purchase all the assets of plaintiff. The agreement provided that the purchase price would be the agreement by Rome to pay the liabilities of plaintiff and to deliver a certain number of shares of Rome stock to plaintiff. When Rome exercised the option to pur-

chase, about one and one-fourth years after the contract was made, plaintiff became legally bound to sell and transfer the assets to Rome as provided in the contract. The assets were transferred to Rome, and Rome delivered 27,500 shares of its stock to plaintiff. After dissolution, Rome owned all the assets formerly owned by plaintiff; and the 68 stockholders or groups of stockholders who formerly owned all of plaintiff's 50,000 shares of stock became owners of 27,500 shares of Rome's 407,975½ shares of stock, or less than 7 per cent of Rome's stock. It thus appears that the stockholders who formerly had full control of the assets of plaintiff corporation did not have any control of the assets after dissolution, except insofar as their votes as owners of approximately 7 per cent of Rome's stock might indirectly affect such assets. After the dissolution, Rome operated the plant it acquired from plaintiff, with no basic change in personnel. Although the former president of plaintiff was employed by Rome as general manager of operations of that plant, it does not appear that he had any authority with respect to policy-making matters, or that he had any authority other than an employee. It thus appears that the facts in the present case are quite different from the facts in the San Joaquin case upon which appellant relies. There is nothing in the stipulated facts herein which would justify a conclusion that the contract made between the two corporations, more than a year before the dissolution, was not a bona fide contract providing for the outright sale of plaintiff's assets. As a result of the transfer of assets and the dissolution, there was a substantial change in the business operations and the interests involved. As above shown, Rome controlled and operated the business; and the former stockholders of plaintiff, who formerly had full control of plaintiff's business, had only a 7 per cent interest in the Rome business and in practical effect had no control of the business. Under the facts here, the implied conclusion of the trial judge that there was no reorganization or consolidation or merger, within the meaning of said section 13(k)(1), was correct.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied June 1, 1955, and appellant's petition for a hearing by the Supreme Court was denied July 6, 1955. Traynor, J., was of the opinion that the petition should be granted.